IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Gregory Thomas,                                    :

        Plaintiff                          :        Case No. 2:14-cv-0225

        v.                                 :

Carolyn Colvin,                                    :        Magistrate Judge Abel
Acting Commissioner of Social Security,
                                                   :
        Defendant                          :

                                                   :

# Opinion and Order

Plaintiff Gregory Thomas brings this action under 42 U.S.C. §§405(g) and 1383(c) for review of a final decision of the Commissioner of Social Security denying his applications for social security and supplemental security income benefits.  This matter is before the Court for a decision on the administrative record, plaintiff's merits brief, defendant's memorandum in opposition, and plaintiff's reply brief.

**Summary of Issues.**  Gregory Thomas maintained in his application for benefits that he became disabled in June 2007, at age 40, by seizures, low vision, and imbalance in the brain. (Doc. 10-6, PageID 295.) He was last insured for social security disability benefits March 31, 2009. The administrative law judge found that his severe impairments included syncope, hypertension, osteoarthritis of the right knee, an adjustment disorder with a depressed mood, and a history of alcohol abuse. He concluded that Thomas retained the ability to perform a wide range of light work so long as it involved low stress simple routine tasks that do not involve daily changes, more than superficial

contact with others, strict production quotas, and/or fast paced work.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred in the evaluation of the limitations caused by Mr. Thomas's seizure disorder.
- There is not substantial evidence supporting the administrative law judge's determine that Mr. Thomas can perform the exertional requirements of light work.
- New and material evidence submitted to the Appeals Council justifies remand.

**Procedural History.**  On February 7, 2011, plaintiff Gregory Thomas filed his application for social security disability insurance benefits (doc. 10-5, PageID 254); and on October 12, 2011, he filed an application for supplemental security income benefits (*Id*., PageID 262), alleging that he became disabled on June 1, 2007, at age 40, by seizures, low vision, and imbalance in the brain. (Doc. 10-6, PageID 295.) The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On July 3, 2012, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (Doc. 10-2, PageID 78-153.) A vocational expert also testified.  On October 18, 2012, the administrative law judge issued a decision finding that Mr. Thomas was not disabled within the meaning of the Act. (*Id*., PageID 75-90.) On January 16, 2014, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (*Id*., PageID 6-9.)

2

**Age, Education, and Work Experience.** Plaintiff Gregory Thomas was born on May 7, 1967 (Doc. 10-5, PageID 254.) He has a high school education. He has worked as a grill cook, maintenance worker in a restaurant, and prep cook.[1] (Doc. 10-6, PageID 296.) Thomas last worked May 31, 2007. He was fired because he had missed too many days work. (*Id.*, PageID 295.)

**Plaintiff's Testimony.** The administrative law judge fairly summarized Thomas's testimony as follows:

> [H]e resides with his wife and with his five children.[2] He stated that he lost his driver's license for failure to pay child support. His neighbor provides him and his wife with transportation to the grocery store.
>
> [H]e discontinued working on his alleged onset date of June 1, 2007, because he was fired from his job. He stated that at that time, he was caring for his ill mother, and he frequently had to leave work early or call in sick from work to care for his mother. As a result, he was fired from his job. He testified that he would have continued working at this job, if he had not been fired.
>
> [H]e considers himself to be incapable from work because he feels "bad." He has to have someone with him at all times because he passes out. The claimant stated that this has been the case since 2008 or 2009. He denied that there is any trigger associated with his passing out events.
>
> The claimant complained of experiencing pain in his knees, which he attributed to injuries sustained when he passes out. He testified that he has been provided with a cane by a physical therapist to assist him with walking and that he has been prescribed a knee brace for a torn ligament. He admitted that he does not like wearing the knee brace and that he does

---

[1]The vocational expert testified that Thomas worked as a short order cook, store's laborer, and material handler. (Doc. 10-2, PageID 145.)

[2]Thomas has 10 children. He lives with his wife and four of his children, ages 10 to 16. (*Id.*, PageID 115.)

not always use his cane when walking. He did not have the cane with him
at the time of the hearing, but he was wearing the knee brace. The
claimant testified that he was going [through] the process to obtain an
electric scooter; however, he never completed the process.

[H]e discontinued drinking alcohol in 2010. He denied that he has ever
attended alcoholic anonymous meetings. He has been able to maintain
sobriety because his wife demanded that he stop drinking.

The claimant described his daily activities as spending his entire day at
home with his wife. He is able to grocery shop with his wife.

(Doc. 10-2, PageID 83-84.)  Thomas further testified that he had no trouble lifting

something from the kitchen counter or lifting groceries, although it depends on how

heavy it is. (*Id.*, PageID 137.) His wife does all the housework, laundry, and cooking.

(*Id.*) He feels bad that he cannot help his wife. (*Id.*, PageID 138.) His son does the yard

work. He stopped doing it when he was mowing the lawn and passed out.  He attends

church on Sunday. (*Id.* and Doc. 10-7, PageID 749.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly

sets out the relevant medical evidence of record.  This Report and Recommendation will

only briefly summarize that evidence, focusing on Thomas's treatment for seizures and

pain in his right knee.

**Physical Impairments.**

**History of alcoholism and passing out.** It is uncontroverted that Thomas has a

history of alcoholism. He sought emergency room treatment in November 2007 and

February 2008 with complaints of abdominal pain, nausea, and vomiting. The diagnoses

were alcohol abuse and gastroenteritis. (Doc. 10-7, PageID 476-77 and 480.)

On March 3, 2008, he sought emergency treatment for nausea and vomiting, sore throat, chest pain, and lack of energy. He reported drinking heavily daily. He had no family doctor. He had never been through detoxification. (*Id.*, PageID 529.) The final diagnoses were alcohol intoxication, alcohol abuse, and GERD. Thomas was instructed to call Maryhaven to arrange follow-up treatment for his alcoholism. (*Id.*, PageID 530.)

On March 11, 2008, he returned to the ER after having an apparent syncopal episode at the grocery store. He fell into his wife's arms, and she gradually brought him to the ground. He did not bite his tongue or urinate himself. He was confused when he regained consciousness. Thomas considered himself an alcoholic. He reported drinking about 10 beers and wine every day. (*Id.*, PageID 531.) A CT-scan of the head was normal. He was offered admission to go through withdrawal, but he declined. He was discharged against medical advice. The diagnoses included syncope and alcoholism. (*Id.*, PageID 532.)

From March 19 to 26, 2008, Thomas was hospitalized with complaints of abdominal pain, nausea and vomiting for over a week. He claimed to have had 4-5 syncopal episodes over the previous year, with 2 of them being in the previous week to week and a half. (*Id.*, PageID 349.) He never suffered trauma because his wife had always been able to stop his fall before he hit the ground. His longest period of sobriety was 6 months during 1991. He had never experienced DTs. (*Id.*, PageID 350.) A neurological exam was negative. (*Id.*, PageID 352.) The discharge diagnoses included acute pancreatitis secondary to severe hypertriglyceridemia and alcoholism and alcoholism with

withdrawal symptoms. (*Id.*, PageID 355.)

In April 2008, Thomas again sought treatment in an ER. The diagnoses were esophagitis, gastritis, alcoholic hepatitis, and pancreatitis. (*Id.*, PageID 533-34.) Thomas was again hospitalized from May 6 to 9, 2008 for detoxification. His chief complaint was chemical dependence (ETOH). (*Id.*, PageID 365-67.)  On discharge, his insight was said to be poor. He could benefit from case management and a longer term of in-patient treatment.  (*Id.*, PageID 377.)

In August 2008, Thomas went to an ER, reporting he had a seizure that evening. He did not fall. His last seizure had been in March. He continued to drink despite his cirrhosis. His past medical history was said to include a history of questionable seizures, cirrhosis, pancreatitis, and reflux. (*Id.*, PageID 536.) A neurological exam was essentially normal. The assessment was seizure secondary to alcohol withdrawal. (*Id.*, PageID 503-04.) An EEG was normal. (*Id.*, PageID 562.)  On September 10, 2008, Thomas sought ER treatment for intermittent abdominal pain. He had been drinking. (*Id.*, PageID 539.) A September 15, 2008 EEG was normal. (*Id.*, PageID 364.)

On September 25, 2008, he sought ER treatment for blood in his stool. He said he had been trying to wean himself from drinking but had been drinking that evening. (*Id.*, PageID 541.) The diagnoses were pancreatitis and gastrointestinal bleeding. (*Id.*, PageID 542.) On December 18, 2008, Thomas sought treatment at the ER for 2 seizures during the previous 24 hours. A neighbor observed him drop to his lawn and start convulsing. The apparent seizure lasted about 5 minutes. There was no incontinence or urine. His

6

wife confirmed that Thomas had been drinking throughout the day. He had experienc-
ed nausea and vomiting throughout the day. Thomas was supposed to be on anti-
seizure medication but had not taken it for the most part over the previous 6 months.
(*Id.*, PageID 544.) The assessment included acute alcohol intoxication with alcoholism
and seizures, probably alcohol exacerbated. (*Id.*, PageID 545.)

     In February 2009, Thomas went to an ER with the chief complaint of seizure. (*Id.*,
PageID 468.) But he said he did not have seizures, he just drank too much alcohol after
not eating food yesterday. His wife said the children witnessed the seizure, but there
was no description. Starting in the fall, he had one seizure every 4 or 5 weeks. He got
medication then, but he does not take it. He drank at least 64 ounces of beer a day. He
smelled of alcohol, but told examiners that he did not feel intoxicated. He refused medi-
cal tests because he was "fine" and "knows he has just been drinking too much." (*Id.*,
PageID 469.)

     In March 2009, Thomas went to an ER for a generalized tonic-clonic seizure after
not drinking for one day. He was hospitalized for 3 days. His wife said he had been ill
for 6-8 months, vomiting almost daily. He gave a history of daily alcohol use for years.
(*Id.*, PageID 449.) His last seizure had been in February 2009. His wife said the seizures
started in 2008. Thomas said that the seizures began in 2008 as he was trying to cut
down his alcohol consumption or was unable to drink for a day. He reported 5 total
seizures, all associated with alcohol withdrawal. A neurological exam was essentially
normal. (*Id.*, PageID 450-51.) His treators recommended physical therapy for gait train-

ing and in-patient alcohol withdrawal. (*Id.*, PageID 451.) The discharge diagnoses in-cluded ETOH abuse, ETOH withdrawal seizures, alcohol abuse, and seizure disorder. (*Id.*, PageID 452.)

In August 2009, Thomas went to an ER with the chief complaint of alcohol intoxi-cation. He had been drinking earlier in the day and passed out on a bus. He did not fall down. His wife got him off the bus before calling the squad to help him out. He said he did not have a seizure, he had just been drinking. (*Id.*, PageID 549.) A neurological exam was negative. He was ambulatory and did not have an unsteady gait. (*Id.*, PageID 550.)

**Treating neurologist: Dr. Mazen Eldadah**. Dr. Eldadah was Thomas's treating neurologist from August 2010 through at least July 2012.[3] (Doc. 10-7, PageID 760-772.) On August 11, 2010, Dr. Eldadah's diagnoses were disequilibrium, fainting spell, and alcohol dependence. The treatment plan included Klonopin and quitting alcohol. (*Id.*, PageID 771.) Thomas  reported using alcohol every day. He started drinking alcohol at age 12. During the previous year, he had passed out several times. He had passed out twice in 2010. (*Id.*, PageID 772.) Thomas's calves were tight, and he had a wide base gait. (*Id.*)

On September 8, 2010, Thomas gave a history of passing out 9 times in the prev-

---

[3]At the July 2012 hearing before the administrative law judge, Thomas testified that he continued to see Dr. Eldadah. He had an appointment with him scheduled for September 6. (Doc. 10-2, PageID 140.) August 28, 2012 treatment records form Livingston Lockbourne Family Health indicate that Thomas said he needed a referral to a neurologist because his current neurologist was closing his practice. (Doc. 10-8, PageID 890.) On November 15, 2012, that practice scheduled an appointment for Thomas with a new neurologist. (*Id.*, PageID 61.)

ious 2 days. He was blacking out. His lower extremities were swollen. He said it was hard to get up in the morning. Thomas had not gotten all the testing the doctor had requested done. The office staff had tried to reach him by phone, but nobody answered. Dr. Eldadah stressed the importance of completing the testing. (*Id.*, PageID 770.)

On October 19, 2010, Thomas reported passing out two times since the last visit. The sensory exam was negative. All the test results were back. Dr. Eldadah "stressed to pt <u>No</u> Alcohol." (*Id.*, PageID 768.)(Emphasis in original.) On December 14, 2010, Thomas reported that he was still passing out. He passed out cutting the grass. He passed out the week before. His wife was also sick. Thomas gave poor descriptions of his fainting spell. There was no falling, but he was still unsteady on his gait. He told the doctor that he was not using alcohol. He had sold his car. Dr. Eldadah encouraged Thomas to continue to do exercises for his balance. (*Id.*, PageID 766.)

On January 11, 2011, Thomas was "doing OK," but he did report passing out shoveling snow. He fell the week before and hit his head. The neurological exam was negative. Thomas reported no convulsions. He thought the medication was helping. (*Id.*, PageID 765.)

On February 8, 2011, he continued to do well. He had passed out one time since his last visit. The neurological exam was negative. His gait was normal. Dr. Eldadah's notes say "he thinks he fainted once." (*Id.*, PageID 764.) He did not have convulsions. His gait was a lot better. He looked healthier. When Dr. Eldadah first saw Thomas, he was "unable to walk. Now he rides his bike." (*Id.*)

9

On May 3, 2011, Thomas complained of his legs tightening up. He passed out 3-4 times. His balance was off. The sensory exam was negative, but his gait was wide base. Dr. Eldadah again told Thomas "to stop drinking at all." (*Id.*, PageID 763.) Although he complained of muscle tightness in the legs, on examination the calves were soft and non-tender. The doctor thought he might have smelled alcohol. Thomas gave no clear history about his fainting spells. (*Id.*)

On July 15, 2011, Thomas reported 3 seizures since his May visit. The neuro-logical exam was negative, but his gait was wide base. The plan included a comment about the latent effect of alcohol. Dr. Eldadah encouraged Thomas to continue walking. The doctor noted that no family member accompanied Thomas for the appointment, so there was no one to confirm his fainting spells. Dr. Eldadah "again talked about the importance to quit drinking alcohol." (*Id.*, PageID 762.) He also noted that Thomas's "work up so far [is] negative." (*Id.*)

**Livingston-Lockbourne Family Health.** On May 11, 2011, Thomas told his doctor that he had passed out on his lawn mower. (Doc. 10-7, PageID 749.) The doctor reviewed with him his medications and discussed with him how to take them. (*Id*, PageID 750.) On June 21, 2011, Thomas reported that he was still passing out. (*Id.*, PageID 747.) On July 29, 2011, Thomas said he was passing out 3-4 times a month. His chief complaints were seizures and disequilibrium. (*Id.*, PageID 745.)

Knee problems. On September 21, 2010, Thomas came to an ER with a complaint of progressively worse swelling in both knees for three weeks. The swelling was pri-

10

marily in the left knee. (*Id.*, PageID 557.) On examination, there was tenderness in the left calf. The impressions were bilateral lower extremity edema and acute left calf pain. (*Id.*, PageID 558.) A September 21, 2010 MRI found a gastrocnemius tendon tear in the area of the left tibia. (*Id.*, PageID 556 and 665.) A November 8, 2009 x-ray of the right knee found mild to moderate lateral knee compartment osteoarthritis. (*Id.*, PageID 661.)

In February 2012, Thomas was evaluated by Amy Grace, an occupational therapist with Columbus Medical Equipment. She submitted a request for a motorized wheelchair. (*Id.*, PageID 797-802.) Grace said a wheelchair was necessary because Thomas was nonambulatory due to a seizure disorder and a left leg injury. She said an injury to his left tibia caused instability. (*Id.*, PageID 797.) The wheelchair was put on hold because the provider was not sure that Thomas could get the chair into his house. However, Grace encouraged Thomas to initiate new paper work to request the chair. (*Id.*, PageID 855.)

Mr. Thomas injured his right knee during a seizure and received treatment at Grant Medical Center on April 30, 2012. (*Id.*, PageID 840-48.) He had developed mild swelling and was diagnosed with a contusion (*Id.*, PageID 842 and 846).

On May 23, 2012, Thomas went to an ER with right knee pain and swelling. He said he had a seizure and fell two weeks before. He denied numbness, tingling or weak-necessary. System reviews were negative. (*Id.*, PageID 862.) On examination, he had soft tissue swelling around the right knee. There was a full range of motion in the right knee without pain. There was pain on palpation of the medial and lateral aspects of the

11

patella. There was no obvious deformity. Muscle strength was 5/5. He performed straight leg lifts without difficulty. (*Id.*, PageID 863.) X-rays were interpreted to show joint effusion and anterior soft tissue swelling and a questionable nondisplaced transverse patellar fracture. (*Id.*, PageID 858-59 and 863.) The examining nurse practitioner's impressions were joint effusion and anterior soft tissue swelling; questionable nondisplaced transverse patellar fracture; and mild tricompartmental osteoarthritis. (*Id.*, PageID 863.) He was place in a knee mobilizer and told to follow up with orthopedics. (*Id.*, PageID 864.)

State Agency residual functional capacity assessments. On May 6, 2011, Dr. Gary Hinzman reviewed the medical evidence and concluded that Thomas has no exertional limitations, but can only frequently climb ramps and stairs, never climb ladders, ropes and scaffolds, and must avoid even moderate exposure to unprotected heights, commercial driving, and dangerous machinery. Dr. Hinzman also reported that drug and alcohol addiction is involved, but not material to the claimant's disability. (Doc. 10-3, PageID 125-26.) On September 27, 2011, Dr. Jerry McCloud agreed with Dr. Hinzman's residual functional capacity assessment. (*Id.*, PageID 196-97.)

**New evidence.** Plaintiff submitted the following evidence to the Appeals Council after the administrative law judge' October 18, 2012 decision denying him benefits.

Star Imaging. An April 25, 2012 MRI of the liver and pancreas was interpreted to show liver cirrhosis and a cyst on the pancreas. (Doc. 10-3, PageID 888.)

Livingston Lockbourne Family Health treatment records from April 25 through

November 12, 2012. On April 25, 2012, Thomas reported right knee pain since his last seizure one week before. (Doc. 10-8, PageID 891.) On June 27, 2012, Thomas's chief complaints were said to be high blood pressure, right knee pain, and low back pain. He said that he recently fell over a sofa during a seizure and that his ribs on the left side hurt. At times he was short of breath. There is no description of the seizure in the treatment notes. (*Id.*, PageID 884.) A July 2, 2012 x-ray showed a non-displaced fracture of the left anterior tip of the sixth and seventh ribs. (*Id.*, PageID 875-76.) On August 28, 2012, Thomas said he needed a referral to a neurologist because his current neurologist was closing his practice. (*Id.*, PageID 890.) On November 15, 2012 Thomas's chief complaints were said to be low back pain and three seizures in the preceding two weeks. The seizures were not described. (Doc. 10-2, PageID 59.) An appointment was scheduled with a new neurologist. (*Id.*, PageID 61.)

On February 8, 2013, prepared by Dr. Quirico G. Cristales a general practitioner with Livingston Lockbourne Family Health executed a residual functional capacity assessment. He said that Thomas's low back pain and degenerative joint disease limited him to lifting and carrying up to 10 to 15 pounds, standing/walking and sitting to one hour at a time, up to four hours total. His seizures limited him to rarely climbing, balancing, crouching, kneeling, and crawling, occasionally stooping, pushing and pulling, avoid-ing heights, moving machinery, temperature extremes, pulmonary irritants, and noise, and having a sit/stand option. (*Id.*, PageID 70-71.)

A September 5, 2013 instruction to Thomas from Lucretia Long at Neurology at

13

Gahanna CarePoint, states:

> Please have your wife come in with you next time you come to the office.
> We really need to know how frequently you are having seizures and how
> you are taking your medications.
>
> You will be called to make an appointment for the Epilepsy Monitoring
> Unit. You will be admitted to the hospital for 4-5 days.

(Doc. 10-2, PageID 49.) An October 10, 2013 office record of Dr. Sheri Hart, a neurologist
at the Wexner Medical Center of OSU Hospital, recorded the diagnosis of intractable,
unspecified epilepsy. However, no clinical notes are included in the exhibit. (*Id*., PageID
48.) An October 10, 2013 note from Dr. Hart "To Whom It May Concern" states that
Thomas is "unable to work secondary to uncontrolled convulsions." No clinical notes or
test results are included in the exhibit.  (*Id*., PageID 45.) Thomas's seizure diary for the
period June 19 to October 6, 2013 contains 6 entries but little information about the
nature of the seizures. No injuries are recorded. The seizures were of short duration.
Thomas does say that he has become more frightened by his condition, and he has
become more forgetful. (*Id*., PageID 46.)

**Psychological Impairments.**

Plaintiff has never sought psychological treatment. In April 2011, Dr. James
Tanley, a clinical and neuropsychologist, performed a disability evaluation for the
Social Security Administration. (Doc. 10-7, PageID 740-43.) Thomas described his health
and medications as follows:

14

"I get seizures. It's a little more than two years. The neurologist thinks it's because of my drinking history. It's affected my brain. I tore a ligament in my left leg. I've passed out three times. I just blackout. My hands tighten 'n curl. My balance is off, need somebody with me at all times. I have gastritis. I get irritable easily. I've never seen a psychologist before." Current medications include Promethazine, Lamictal, Amlodipine, Clonazepam, Lansoprazole, Augmentin, Diazepam, Omeprazole, Ciproheptadine, B-C Plus Vitamins, Iron, and Furosemide.

(*Id.*, PageID 740.) He reported drinking every day from age 12 until he stopped during 2010. (*Id.*)

Dr. Tanley provided the following information about plaintiff's affect and mood:

Affect was appropriate to thought content, and eye contact was good. "My appetite is okay (5'6" tall@ 160 pounds). I wake off 'n on when I sleep." He did not cry during the examination, nor did he report any suicidal/ homicidal ideation. Psychomotor activity was within acceptable limits. There were no allegations of guilt, hopelessness, helplessness, or worthlessness. Energy level appeared adequate. He alleged mood problems without anhedonia, inflated self-esteem, or grandiosity.

(*Id.*, PageID 741.) Clinically, Dr. Tanley made the following sensory and cognitive findings:

He was alert and oriented X 4. Recent and remote memory were intact. He remembered 4 digits forward and 3 backwards, but he needed a reminder for the backwards task. He gave 1 abstract, 1 concrete, and 1 "I don't know" response to 3 proverbs. He gave 2 abstract with 1 concrete response to 3 similarities. He slowly and accurately recited the alphabet and performed Serial 3 Addition, and he counted backwards satisfactorily, but he exceeded the time limit. He forgot 3 items after 5 minutes with interference. His current level of intellectual functioning appears to be no lower than Borderline.

(*Id.*)

Thomas described his daily activities as follows:

"I get up at 5 to get the children ready for school. I watch TV 'n try to keep

loose. My wife does all the chores. I read the Bible. I don't have any hob-
bies. We in bed no later than 7:30, 8:00."

(*Id.*, PageID 741.)

> Dr. Tanley made the following findings and conclusions:
>
> The claimant said that he has a seizure disorder which may be due to his
> heavy drinking in the past. He said he has torn a ligament in his left leg.
> He also has gastritis. He noted a sleep disturbance with mood problems.
> These symptoms in addition to the cognitive insufficiency demonstrated
> on today's MSE yield a symptom severity GAF no higher than 50. Func-
> tionally, the claimant gets up at 5 in the morning to get his children ready
> for school. He then watches television. His wife does all the chores. The
> claimant reads the Bible. Functional severity appears to be no higher than
> 80.
>                                         . . .
>
> The claimant had no difficulty understanding the task requirements of
> today's CE, so he appears capable of comprehending and completing
> simple, routine ADL tasks both at home and in the community. However,
> given his efforts on the mental status exam, he may be expected to demon-
> strate some problems understanding, remembering, and following in-
> structions.

(*Id.*, PageID 742.) He gave no indication of problems with authority figures, although

his depression might interfere with his ability to interact with supervisors and co-

workers. His ability to respond appropriately to work pressures appeared to be sig-

nificantly impaired by depression and borderline intellectual functioning. Dr. Tanley's

diagnoses were adjustment disorder, chronic depressed mood, and borderline intelli-

gence. (*Id.*)

On May 4, 2011, Dr. Leslie Rudy, a psychologist, reviewed the record and made a

mental residual functional capacity evaluation. (Doc. 10-3, PageID 165-67.) She conclude

that plaintiff is limited to short and simple instructions, simple routine tasks in a setting without demands for fast pace or high production, occasional and superficial interaction, and occasional changes with some supervisory support. Further, Thomas's depressI've symptoms interfere with his ability to sustain persistence. (*Id.*, PageID 166.) On Sept-ember 26, 2011, Dr. Patricia Semmelman, a psychologist, reviewed the medical record and agreed with the limitations found by Dr. Rudy. (*Id.*, PageID 197-99.)

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social Secur-ity Act only through March 30, 2009. (Doc. 10-2, PageID 77.)
2. The claimant has not engaged in substantial gainful activity since June 1, 2007, the alleged onset date. (*Id.*)
3. The claimant has the following severe impairments: (1) syncope, possibly related to a seizure disorder; (2) hypertension; (3) osteoarthritis of the right knee; (4) an adjustment disorder with a depressed mood; and (5) a history of substance abuse. (*Id.*)
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (*Id.*, PageID 43.)
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a wide range of light work, as that term is defined in 20 CR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift and carry 20 pounds occasionally and ten pounds frequently. He is precluded from working in environments involving exposure to unprotected heights or hazardous machinery. The claimant retains the capacity for low stress simple routine tasks, which in the instant case is defined as tasks that do not involve daily changes, more than superficial contact with others, strict production quotas, and/or fast paced work. This residual functional capacity is consistent with the opinions of Dr. Rudy (Exhibits 1A and 2A) and Dr. Semmelman (Exhibits 5A and 6A) and it is well- supported by the record as a whole. (*Id.*, PageID 83.)
6. The claimant is unable to perform any past relevant work. (*Id.*, PageID 87.)
7. The claimant was born on May 7, 1967 and was 40 years old, which is

17

defined as a younger individual age 18-49, on the alleged disability
onset date. (*Id.*, PageID 88.)

8. The claimant has at least a high school education and he is able to com-
municate in English. (*Id.*)

9. Transferability of job skills is not material to the determination of dis-
ability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not
the claimant has transferable job skills. (*Id.*)

10. Considering the claimant's age, education, work experience and resid-
ual functional capacity, there are jobs that exist in significant numbers
in the national economy that the claimant can perform. (*Id.*)

11. The claimant has not been under a disability, as defined in the Social
Security Act, from June 1, 2007, through the date of this decision. (*Id.*,
PageID 89.)

(Doc. 10-2, PageID 77-89.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

of the Commissioner as to any fact, if supported by substantial evidence, shall be con-

clusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389,

401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is

"'more than a mere scintilla.'"  *Id.*  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976).  The Commissioner's findings of fact must be based upon the record as a whole.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Uni-*

18

*versal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred in the evaluation of the limitations caused by Mr. Thomas's seizure disorder.
- There is not substantial evidence supporting the administrative law judge's determine that Mr. Thomas can perform the exertional requirements of light work.
- New and material evidence submitted to the Appeals Council justifies remand.

**Analysis.**

**Seizure disorder.** Plaintiff argues that the administrative law judge erred in his determination that Thomas's seizure did not preclude his employment. He maintains that the administrative law judge selectively cited parts of the record that tended to support his conclusion without considering the record as a whole. Plaintiff points out that Thomas continued to experience seizures after he had stopped drinking. As a result of his selective use of the medical record, plaintiff argues, the administrative law judge failed to make a full assessment of Thomas's seizures as required by Social Security Ruling 96-7p.

The administrative law judge made the following findings regarding the impact of Thomas's seizures on his ability to work:

In terms of the claimant's alleged passing out episodes, the objective

19

evidence of record documents that although the claimant complains of these episodes, no treating or examining physician has ever witnessed such an event (Exhibits 3F, SF, 9F, and 13F). In fact, the claimant's own treating neurologist has reported that the claimant's neurological work up and all of his neurological examinations have been completely negative for any objective signs that would support that the claimant truly experiences seizures (Exhibits SF, 9F, and 13F, generally). He has never reported experiencing, nor has he been observed to experience any convulsive symptoms of a seizure, such as biting his tongue, having loss of bowel of bladder control, or experiencing convulsive jerking of his body. Dr. Eldadah also noted that the claimant never provided a clear history related to his fainting spells (Exhibit 9F, pages 4 and 7). More significantly, Dr. El-dadah has related that he believes that the claimant's fainting spells were the primary result of the claimant's alcohol use (Exhibit 9F, page 3), and he noted on at least two occasions that the claimant smelled of alcohol during his office visits (Exhibit 9F, page 4). The evidence further documents that the claimant is noncompliant with taking his seizure medication as prescribed (Exhibit 3F, pages 20 and 53, and see also 9F, page 4). Continued alcohol consumption and lack of compliance with prescribed medication is, of course, expected to contribute to the passing out symptoms of which the claimant complains.

Finally, it was also the opinion of Dr. Eldadah that the claimant should continue walking and that he should not pursue obtaining a wheel chair or an electric scooter (Exhibit 9F, page 3). It is not expected that Dr. Eldadah would have this opinion if the claimant truly experienced a disabling level of symptoms that would preclude him from engaging in this activity and similar activities that would preclude all work.

. . .

With regard to the claimant's alcohol consumption, the objective evidence of record establishes that despite the claimant's allegations that he has been abstinent from all alcohol use since 2010, the totality of the evidence reflects that the claimant continued to use alcohol through at least 2011, if not to the present time. This finding is supported by the August 16, 2008 statement of the claimant, that he had resumed drinking alcohol on the very day that he was released from Talbott Hall on May 9, 2008 (see Exhibits 2F and 3F, page 11). This admission is substantiated by the totality of the evidence that the claimant regularly admitted to ongoing daily alcohol consumption (Exhibits 3F, pages 14, 40, 42, 53, 58; 9F, page 454; 3F, page 14; 12F) and also that the claimant was noted to smell of alcohol by his treating neurologist (Exhibit 9F, pgs 3-4).

20

> Continued alcohol consumption is, of course, expected to contribute to the passing out symptoms of which the claimant complains. In fact, the evidence intimates that during a brief period of sobriety from alcohol in February 2011, the claimant's reported symptoms improved significantly, to the extent that he was reported to be "doing good," with "no issues." It was also noted that the claimant's symptoms had improved to such an extent that he had been able to resume riding a bicycle (Exhibit 5F, page 3)

(Doc. 10-2, PageID 84-86.) The administrative law judge further discounted Thomas's statement of his subjective complaints based on evidence that he exaggerated his symptoms and made many inconsistent statements. (*Id.*, PageID 86.)

Analysis. The administrative law judge's decision is supported by substantial evidence. While he could have credited Thomas's testimony that he continued to suffer seizures after quitting drinking, the medical evidence did not require him to do so. Thomas consistently failed to provide his treating neurologist with good descriptions of his passing out episodes. All the tests Dr. Eldadah ordered were negative. Neurological examinations were essentially negative, although he did exhibit a wide base gait. The only injury Thomas suffered in a seizure was a contusion to his right knee. He never urinated or lost control of his bowels during a seizure.

Beyond the meager objective medical findings, there is support for the administrative law judge's findings that Thomas exaggerated his symptoms and made inconsistent statements. For example, he came to the administrative hearing without the assistance of even a cane, yet he had applied for a motorized scooter. He did not wear a prescribed knee brace. He at least on the occasions documented in his treatment records engaged in activities such as mowing the lawn, shoveling snow, and riding a bicycle,

yet testified to very limited daily activities. Similarly, although he said he had to have someone with him at all times because of his fainting spells, he went to many appointments with his neurologist alone. On one occasion, Thomas complained of tightness in his calves to Dr. Eldadah, on examination both calves were soft and non-tender. Finally, Dr. Eldadah questioned whether Thomas had stopped drinking and repeatedly counseled him not to drink at all.

While the administrative law judge could have come to a different conclusion, his decision demonstrates that he carefully reviewed the record as a whole and found that Thomas's seizures did not preclude all substantial gainful employment. Since that determination is supported by substantial evidence, it must be affirmed.

**Physical limitations.** There is no clinical, x-ray, EMG, or other medical test evidence in the record documenting a disabling low back impairment. Thomas did have some swelling in both knees, but the medical records do not indicate that the swelling lasted for a period of 12 or more months. He did sustain an injury to the right knee and there is x-ray and MRI evidence of some osteoarthritis and degenerative joint disease. But clinical examinations have found a full range of motion in the knee without pain. There is no evidence of treatment for the right knee with supporting clinical findings that would indicate the condition prevented substantial gainful activity for a period of 12 or more months. In short, there is substantial evidence supporting the administrative law judge's determination that physically plaintiff retains the ability to perform a range of work having light exertional demands.

22

**Request for remand.** When the Appeals Council denies a claimant's request for review, the decision of the administrative law judge becomes the final decision of the Commissioner.  *Casey v. Secretary. of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).  This Court reviews the administrative law judge's decision, not that of the Appeals Council denying the request for review.  *Id.*  Consequently, only evidence of record before the administrative law judge may be considered by the District Court in reviewing the final decision of the Commissioner of Social Security denying benefits. *Cline v. Comm'r. of Social Security*, 96 F.3d 146, 148-49 (6th Cir. 1996).  A claimant may seek remand so that the evidence presented to the Appeals Council can be considered by the administrative law judge.  *Id.*; *Gartman v. Kenneth S. Apfel, Commissioner of Social Security*, 220 F.3d 918, 922 (8th Cir. 2000).

Section 405(g), sentence six, provides, in relevant part:

> The court may . . . at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

The evidence supporting a motion to remand must be both new and material.  *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996).  Evidence is "new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990)." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001).  It is material "only if there is 'a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if

presented with the new evidence.' *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988)." *Id.* Good cause is shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ADMINISTRATIVE LAW JUDGE. *Willis v. Secretary of Health & Human Services,* 727 F.2d 551, 554 (1984)(per curiam). *Id.* Merely cumulative evidence does not establish good cause for a remand. *Borman v. Heckler,* 706 F.2d 564, 568 (6th Cir. 1983); *Carroll v. Califano,* 619 F.2d 1157, 1162 (6th Cir. 1980). The plaintiff has the burden of establishing that the evidence is new and material and that there is good cause for not having presented the evidence to the Administrative Law Judge. *Id.,* citing, *Oliver v. Secretary of Health & Human Services,* 804 F.2d 964, 966 (6th Cir. 1986).

Analysis. As defendant pointed out in her brief, to which plaintiff did not respond, plaintiff has failed to offer any explanation for not including in the medical record those records of treatment before and during the three months after the hearing before the administrative law judge. Further, none of those medical records could have reasonably changed the administrative law judge's decision. As to the remaining records submitted to the Appeals Council, plaintiff has offered no explanation about how the findings and opinions stated in them relate back to the period ending October 18, 2012.

Although Dr. Cristales's February 8, 2013 residual functional capacity assessment states that Thomas has physical limitations based on his low back pain and degenerative joint disease, he does not support his assessment with medical test results or

24

clinical findings. Further, there is nothing in his office notes supporting those conclusions. Sim-ilarly, Dr. Hart expresses the opinion that Thomas's seizures prevent him from work-ing, but her opinion is unsupported by references to medical tests or clinical findings. There are no office notes in the record from her. Although the September 5, 2013 in-structions from Dr. Long to Thomas state that he had an appointment with an epilepsy monitoring unit, there were no records regarding epilepsy monitoring submitted to the Appeals Council. Since they lack supporting medical test or clinical findings, neither Dr. Cristales's nor Dr. Hart's opinions could have reasonably changed the administrative law judge's decision.

For the reasons stated above, I find that plaintiff has failed to demonstrate good cause for a remand.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, the decision of the Commissioner of Social Security be **AFFIRMED.**


s/Mark R. Abel                          
United States Magistrate Judge